UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DESHAWN HAROLD JEWELL,

Petitioner,

v.                                                     Case No. 19-cv-658-pp

WARDEN RANDALL R. HEPP,

Respondent.

**ORDER DISMISSING *HABEAS* PETITION (DKT. NO. 1), DISMISSING CASE
WITH PREJUDICE AND ISSUING CERTIFICATE OF APPEALABILITY**

On May 6, 2019, the petitioner, who is incarcerated at the Wisconsin
Secure Program Facility and is representing himself, filed a petition for writ of
*habeas corpus* under 28 U.S.C. §2254 challenging his 2015 conviction in
Milwaukee County Circuit Court for armed robbery with use of force and bail
jumping. Dkt. No. 1 at 1-2. On May 14, 2019, Magistrate Judge William E.
Duffin screened the petition, allowed the petitioner to proceed and ordered the
respondent to answer or otherwise respond. Dkt. No. 5. The case was
subsequently assigned to this court and the parties have fully briefed the
petition. The petitioner is not entitled to *habeas* relief. This order dismisses the
petition and the case but grants the petitioner a certificate of appealability.

1

## I. Background

### A. Underlying State Case

#### 1. *Trial in Milwaukee County Circuit Court*

In its order affirming the petitioner's conviction, the Wisconsin Court of Appeals summarized the facts relevant to the charges of which he was convicted:

> On May 1, 2015, [the petitioner] was charged with one count of armed robbery and one count of bail jumping for the armed robbery of C.F. According to the criminal complaint, on March 21, 2015, C.F. was walking to her car after leaving a Milwaukee-area bar when a car pulled up near her. The driver of the car exited, approached C.F. and said, "Give me your purse, or I'll shoot you." C.F. resisted, but the driver was able to take her purse and drive away. C.F. told police that the robber's knit cap fell off during the struggle for her purse. A DNA analysis of the cap revealed a match to [the petitioner]. C.F. also identified the petitioner from a photo array.

Dkt. No. 9-2 at ¶2.

The victim testified at trial that the petitioner had pulled up to her in his car as she was leaving a bar and told her he had a gun. Id. at ¶3. She said the petitioner demanded her purse and the two scuffled until the petitioner got control of the purse and fled, leaving his knit cap at the scene. Id. The victim subsequently identified the petitioner as the man who had robbed her and testified that one month after the robbery she had identified him from a photo array consisting of eight folders. Id. at ¶4. The victim identified the petitioner at trial as the person who'd tried to rob her. Dkt. No. 9-8 at 19-20, Tr. Page 19 lines 20-25; Tr. Page 20 lines 1-13. She identified the hat the petitioner had been wearing, the one that had been knocked off during their somewhat extensive tussle. Id. at 21-22, Tr. Page 21 lines 6-25; Tr. Page 22 lines 1-6. She

2

described identifying the petitioner from the photo array about a month later. Id. at 23-24, Tr. Page 23 lines 17-25; Tr. Page 24 lines 1-22.

Jeffrey Emanuelson—the police offer who showed the victim the photo array—also testified about the photo array shown to the victim. Dkt. No. 9-2 at ¶5. He stated that the array contained a photo of the suspect and five pictures of people with similar attributes; he testified that before showing someone a photo array, he gives the person a form explaining that the suspect may or may not be in the array and that it is important both to select a suspect and to exclude innocent people. Id. Emanuelson testified that he showed the victim this form prior to showing her the array. Id. Emmanuelson testified that Officer John Kohler shuffled the photos and placed them in eight individual folders, leaving two folders empty; Emmanuelson did not know which folder contained the petitioner's photo. Id. at ¶¶6-7. He showed the victim each folder individually. Id. at ¶7. The victim identified the photo in the third folder—the petitioner—telling Emanuelson that she was "100 percent" certain that that person was the man who robbed her.[1] Id.

---

[1] The respondent provided portions of the trial transcript. It provided the transcript of the jury selection process. Dkt. No. 9-7. It provided the transcript for the *morning* of the second day of trial—opening statements, the testimony of the victim, *part* of Emanuelson's testimony and the testimony of the State's DNA expert. Dkt. No. 9-8. And it provided the transcripts for the morning and afternoon of the third and last day of the trial. Dkt. Nos. 9-9, 9-10. What is missing is the transcript of the afternoon of the second day—when, the court assumes, Emanualson returned to the stand after having had his testimony interrupted earlier in the day. The court assumes that this was when Emanuelson testified that the victim was 100% certain the photo she selected from the array was the person who'd robbed her.

3

Officer Emanuelson testified that he also compiled a "six pack," which was not shown to the victim but was for internal police use only. Id. at ¶6. The six pack is a "single sheet containing a photograph of each person in the photo array." Id. The six pack was published to the jury without objection at the end of the State's case, and the parties agreed at the close of trial to send the six pack to the jury if they requested it during deliberations. Id. at ¶9.

Officer Kohler also testified on the process of compiling the photo array. Id. at ¶8. He told the jury that

> My partner, Officer Emanuelson, had prepared the array, and part of that process is to shuffle the folders. This way the person showing the photo array, and in this case my partner, Officer Emanuelson, does not know the order or where the suspect is located in there. So my role in the matter was to shuffle them and place the suspect, like I said, where he doesn't know it is.

Id.

The State's DNA analyst testified that the lab received the hat the perpetrator left at the scene. Dkt. No. 9-1 at 79, Tr. Page 79 lines 24-25. She explained that in testing, she looked at "15 specific locations in a person's DNA for their types," as well as a sixteenth location to determine gender. Id. at 84, Tr. Page 84 lines 20-24. The expert testified that the petitioner's DNA was a match to the DNA recovered from the hat at all fifteen locations. Id. at 86-87, Tr. Page 86 lines 7-25; Tr. Page 87 lines 1-14. She testified that, to a reasonable degree of scientific certainty, the petitioner was the major contributor source of the DNA obtained from the hat. Id. at 89, Tr. Page 89, lines 3-9. On cross, the expert testified that the hat contained a mixture of DNA "of at least two individuals," but that a "major contributor could be

4

determined at all 15 locations," while the minor contributor "was so low that it was essentially uninterpretable" and that the information she had was "too low for [her] to make any comparisons to any other standards." Dkt. No. 9-1 at 106, Tr. Page 106 lines 18-25. She testified that there was a possible third contributor, but that she could not tell whether "it was a true contributor, or if it was a possible artifact from the chemistry that happens with the kit." Id. at 95, Tr. Page 95 lines 5-9.

During its deliberations, the jury sent a note to the court requesting the six pack. Dkt. No. 9-2 at ¶10. "In the absence of the parties," the court sent the six pack to the jury. Id. The jury then sent a note asking, "[i]s the '6 pack' numbering system the same as the order as the photo/folders in the photo array?" Id. Again in the absence of the parties, the judge wrote "no" on the note and sent it back to the jury. Id. The court informed the parties of the jury's question and its answer when the parties returned for the verdict. Id. at ¶11. Defense counsel responded, "[j]ust that on the second question, my preference would have been to have the jury talk about it in their collective memory of the testimony. Although I do know as a defense attorney that the six-pack and the photo array are never the same." Id. The court told defense counsel that it would have overruled her request due to the risk of jury confusion. Id. The jury found the petitioner guilty. Id. at ¶12.

2. *Sentencing*

At sentencing, the prosecutor advised the court that the victim had wanted to be present for the hearing but had to go to work. Dkt. No. 9-11 at 2.

Tr. Page 2 lines 22-25. She provided a written statement asking the court to give the petitioner the maximum sentence it could give. Id. at 4, Tr. Page 4 lines 1-6. The prosecutor noted that the statutory maximum sentence was forty years. Id. at 7, Tr. Page 7 lines 2-3. He asked the court to impose a sentence of seven to eight years of initial confinement. Id. at 7-8, Tr. Page 7 lines 19-22; Tr. Page 8 lines 16-18.

Defense counsel agreed that incarceration was appropriate. Id. at lines 23-25. She asked, however, that the court impose a sentence of three years of initial confinement. Id. at 9, Tr. Page 9 lines 1-3. She advised the court that prior to trial, the state had offered five years of initial confinement. Id. at lines 5-8. Among other arguments, defense counsel told the court that the petitioner wanted to use his time in prison to take on a trade, such as welding. Id. at 11, Tr. Page 11 lines 2-6. She advised the court that the petitioner never had been to prison. Id. at 12, Tr. Page 12 lines 11-14. She indicated that if the court sentenced the petitioner to three years of initial confinement, he would be thirty-one years old when released. Id. at lines 14-17.

The court asked the petitioner whether he wished to speak, and the following exchange occurred:

> THE [PETITIONER] Yeah. I want to apologize to the victim.
> THE COURT: For what?
> THE [PETITIONER]: For this. For what she had to go through as a human being.
> THE COURT: Did you do it?
> THE [PETITIONER]: Sir?
> THE COURT: You don't have to tell me.
> THE [PETITIONER]: I just wanted to say that I was convicted and I take full responsibility for what happened to her.

> THE COURT: The only way you can take full responsibility is if you are the guy that did it. If you are not prepared to admit that, you are not taking full responsibility. You can express remorse for what happened to her that night, but the question is: Are you the cause? The jury said it was. But you don't have to admit it if you don't want to.
>
> THE [PETITIONER]: I don't want to put that on the record.
>
> THE COURT: Okay.
>
> THE [PETITIONER]: I want to apologize and I wish this never happened to her.

Dkt. No. 9-2 at ¶13. The petitioner added that he wanted to use his time to become a "better person and more productive," and he and the judge discussed the petitioner's education and some of his general background. Dkt. No. 9-11 at 14-18.

The judge then discussed the sentencing factors, including the petitioner's "age, education, family, previous record, the impact of the crime on the victim, and [his] failure to accept responsibility." Dkt. No. 9-2 at ¶14. When discussing the offense, the judge said that he considered the petitioner's offense to be an armed robbery. Dkt. No. 9-11 at 19, Tr. Page 19 lines 9-13. When describing the offense, the judge said:

> I mean, I listened to [the victim]. She was very believable. There was the DNA evidence on the hat. The jury found you guilty. They found the State proved the case beyond a reasonable doubt. If I had heard the case, I would of found you guilty beyond any doubt. That is how strong the case was against you. There is absolutely no doubt in my mind that when this woman left that bar, after a hard day of work, had a couple of drinks with a friend, she was accosted in the bar by some jerk, trying to pick her up, and the two were going to Wendy's to get something to eat. They get to the car, and there is no doubt that you came speeding up, jumped out of the car, and said to her, bitch, give me your purse, I Have a gun. Then you proceeded to wrestle with her for the purse. No doubt in my mind that you were that monster. Because that is what you were that night. This woman works very hard for her money. She likes to buy the nice things, a purse. She had her kids medicine in that purse. You took it.

7

Id. at 19-20, Tr. Page 19 lines 13-25; Tr. Page 20 lines 1-9.

The judge also told the petitioner that the crime was a violent one, saying "[i]t was not a burglary. It was not a property crime. You hurt this woman." Id. at 21, Tr. Page 21 lines 4-6. The judge recounted that the victim wanted him to impose the maximum sentence, saying, "Understandably, she wants me to put you in prison for the rest of your life." Id. at lines 23-25. The judge then said:

> You say you are sorry. But the question is: For what? For what the woman went through. Okay. I can buy that. You accept absolutely no responsibility for what you did that night. If you were truly sorry, you would of got up and said, Judge, I did it. Then I could give you the points for that. But I can't give you points for that.

Id. at 22, Tr. Page 22 lines 14-21.

For the robbery, the court imposed a sentence of thirteen years, composed of eight years of initial confinement and five years of extended supervision. Id. at 24, Tr. Page 24 lines 15-20. For the bail jumping, the court sentenced he petitioner to a concurrent sentence of one year of initial confinement and one year of extended supervision. Id. at lines 21-23. The judge also gave the petitioner credit for the 126 days he'd spent in custody prior to the sentencing hearing. Id. at 25, Tr. Page 25 lines 8-12.

### 3. Postconviction Motion

After his conviction and sentencing, the petitioner filed a postconviction motion for a new trial or, alternatively, a new sentencing hearing. Dkt. No. 9-2 at ¶16. The petitioner argued that "'the [c]ourt violated [his] constitutional and statutory right to be present, his constitutional right to counsel, and his right to have his case decided free from extra-record infiltration when it answered

8

the deliberating jury's question with a fact not in evidence to the detriment of [the petitioner] without his or his counsel's presence.'" Id. The petitioner took issue with the trial court's answer to the jury's question on a fact not in the record without consulting the parties, observing that no witness had explained how the six pack was numbered or how that numbering related to the numbering of the photo array (if at all). Id. He also argued that "a new sentencing hearing [was] required because the [c]ourt penalized [him] for exercising his constitutional right to remain silent in the face of the [c]ourt's insistence upon a confession." Id. The postconviction court denied the motion and the petitioner appealed. Id.

4.    *Wisconsin Court of Appeals Decision*

The Wisconsin Court of Appeals broke down the petitioner's appeal into two issues: (1) his right to be present, id. at ¶¶18-24, and (2) his right to remain silent at sentencing, id. at ¶¶25-28. It found no reason to grant a new trial or a new sentencing hearing.

While the court of appeals agreed with the defendant that the trial court should have given his attorney the opportunity suggest a response to the jury's question before responding, it concluded that the error was harmless. Id. at ¶22. It found that the trial court's answer had been based on the undisputed trial testimony, stating,

> Emanuelson testified that the six pack is for internal use only and that the photos contained in the photo array are shuffled before a victim views the folders. Kohler confirmed the shuffling process. Defense counsel conceded that the numbering systems are different. Indeed, [the petitioner's] photo was second in the six pack and third in the photo array, confirming the difference in numbering systems.

9

Moreover, when defense counsel told the trial court that counsel would have preferred the jury be told to rely on its collective memory, the trial court rejected the suggestion. In short, the trial court's answer was factually correct. The fact would not have changed even in [the petitioner] and/or his counsel were present when the trial court answered the jury's question.

Id. at ¶23 (citing May v. State, 97 Wis. 2d 175, 184-85 (1980)).

The appellate court explained that "the trial court's error does not undermine our confidence in the outcome of the trial because there is sufficient evidence to support the verdict." Id. at ¶24. It recounted that the victim twice had identified the petitioner as the man who had robbed her—once in the array and again at trial. Id. It recounted that the victim had testified that during the scuffle for her purse, she'd knocked the perpetrator's knit cap off his head; it recounted that the cap had contained the petitioner's DNA. Id. The appellate court stated that based on these facts, it could not conclude that absent the trial court's answer to the jury's question about the numbering of the six pack, the result of the trial would have been different. Id.

The court of appeals found that the petitioner's argument that "the sentencing court improperly increased his sentence because he invoked his right to remain silent and refused to admit guilt at his sentencing hearing . . . ignores both his statements at the hearing and the factors the court did consider." Id. at ¶27. It found that the sentencing court did not try to force the petitioner into admitting his guilt and then punish him for not doing so, observing that the petitioner himself said he wanted to apologize to the victim. Id. at ¶28. The court of appeals said, "[t]he court simply sought to establish [the plaintiff's] reasons for the apology." Id. The appellate court determined that

10

it was proper for the sentencing court to consider the petitioner's lack of remorse in considering his character; it also noted that the trial court had considered other factors—the impact of the crime, the violent nature of the crime, the petitioner's criminal record and the need to protect the public. Id. It found that the trial court did not rely solely on the petitioner's refusal to admit guilt and thus that the petitioner was not entitled to a new sentencing hearing. Id.

B.     Federal *Habeas Petition* (Dkt. No. 1)

On May 6, 2019, the petitioner filed this federal *habeas* petition. Dkt. No. 1. The petitioner argues that (1) he or his counsel had a right to be present when the circuit court answered the jury question about the six pack and photo array and (2) the sentencing court violated his right to remain silent "by saying it was increasing [his] sentence" based on his refusal to confess. Id. at 6-8.

## II.     Analysis

A.     Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §§2254(d)(1), (2)). A federal *habeas* court

11

reviews the decision of the last state court to rule on the merits of the petitioner's claim. <u>Charlton v. Davis</u>, 439 F.3d 369, 374 (7th Cir. 2006). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. <u>Renico</u>, 559 U.S. at 773. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "The standard under § 2254(d) is 'difficult to meet' and 'highly deferential.'" <u>Saxon v. Lashbrook</u>, 873 F.3d 982, 987 (7th Cir. 2017) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)).

      B.    <u>Right to be Present</u>

          1.    *Petitioner's Supporting Brief*

The petitioner argues that the court must consider the appellate court's harmless error determination "under the elevated standard of *Chapman v.*

California, 386 U.S. 17 . . . (1967)" and asserts that the error cannot be considered harmless unless the court can declare a belief that it was harmless beyond a reasonable doubt—that to prove a constitutional error harmless, the government must prove beyond a reasonable doubt that the petitioner would have been convicted even absent the constitutional error. Dkt. No. 10 at 7. The petitioner contends that "[t]he fact that it was the Judge, as compared to a lesser figure, who appeared to introduce the outside material in this case does not change the fact that it was error to do so;" he asserts that this made the error even more significant. Id. at 8. The petitioner states:

> Surely it is not a stretch of the imagination to assume that when a judge conclusively establishes certain nonexisting facts as a matter of record, a jury would feel free to accept the judge['s] word on the matter without ever going back to the evidence they had before them and decide if what the judge said was correct.

Id.

The petitioner argues that the trial judge's written communication with the jury deprived him of his right to be present under the Fifth, Sixth and Fourteenth Amendments. Id. at 8-9. He asserts that had he been able to participate, he could have participated and perhaps offered an objection. Id. at 8. The petitioner asserts that "by answering the jury's question with facts not in evidence, the . . . trial judge essentially stepped in directed findings of fact in favor of the prosecution thus depriving [the petitioner] of his right to trial by jury as guaranteed by the *Sixth Amendment*." Id. at 8-9 (emphasis in the original). The petitioner says that "[b]efore deliberation the Circuit Court Judge made it clear that if the jurors had any questions the court will talk with the

13

attorneys before answering," and that the court would "answer any questions either in writing or in open court." Id. at 10. He asserts that this gave the jury the impression that "the issue they thought worthy of debate was resolved by the parties agreement or at least after consulting them," when this turned out not to be true. Id. He insists that a court "may not step in and direct a contested finding of fact in favor of the prosecution regardless of how overwhelmingly the evidence may point in that direction." Id.

The petitioner also asserts that the judge answered the question incorrectly. Id. He recounts that "[t]he jury asked whether the numbering system on the six-pack was the same as the order of the photos in the photo array." Id. After noting that the court answered that question "[n]o," the plaintiff says that the trial court acknowledged that "if the numbers are the same, it's a coincidence," thus admitting that it was possible the numbers could be the same. Id. at 11. He says the court's "no" answer was based on a mistaken belief that folders one and seven are always are blank in a photo array, which turned out to be incorrect. Id.

The petitioner says the appellate court looked at only two factors of the harmless error analysis, and asks why, if the trial testimony and evidence were undisputed, did the jury have a question. Id. at 12. He says that the fact that the jury returned its verdict "shortly after" the court answered the question "suggests that the court's response may have induced unanimity by ending a debate among members of the jury about the sufficiency of the State's proofs." Id. at 12-13 (citing Rogers v. United States, 422 U.S. 35, 40 (1975)).

14

The petitioner says that the court's answer favored the prosecution; he believes that the jury was trying to figure out "whether the difference between [the petitioner's] position in the photo array and his position on the six-pack was exculpatory (by calling into question identification or the testimony of State's witnesses) or whether the difference was a coincidence that had no bearing on [the petitioner's] innocence." Id. at 13. He asserts that the court's answer conveyed that the difference was a coincidence; he says the court could have given a "neutral" answer like "I don't know" or "use your collective recollection of the evidence." Id. He asserts that the court's answer "favored the State by plugging an evidentiary hole in the State's case." Id.

2. *Respondent's Opposition*

The respondent argues that the sole issue is whether the appellate court unreasonably applied clearly established federal law governing the harmless error rule. Dkt. No. 15 at 19 (citing Mitchell v. Esparza, 540 U.S. 12, 17 (2003)). The respondent says that the petitioner did not establish that his absence likely affected the jury's verdict. Id. at 21. The respondent explains that the court's answer to the jury's question was correct, because the unchallenged trial testimony indicated that the photos represented in the six pack were shuffled before being put into six of the eight array folders. Id. at 21-22. Although the respondent concedes that if he'd been present, the petitioner could have participated in argument or offered an objection, he asserts that the petitioner has not explained what that argument or objection would have been. Id. at 22. The respondent notes that neither the petitioner nor his counsel

objected to the accuracy of the court's answer when told about it after the fact; defense counsel indicated only that she would have preferred the trial court to tell the jury to rely on its collective memory. Id. at 22-23. He says that neither the petitioner nor his attorney objected at that point that the court had denied the petitioner his right to be present, nor told the court that its answer was wrong. Id. at 23. The respondent argues that it is now too late for the petitioner to argue that the answer was wrong. Id. The respondent contends that the undisputed evidence at trial showed that the petitioner's photo was number 2 in the six pack and number 3 in the array; thus, the respondent argues, the court's answer would have been the same whether the petitioner and his lawyer were present or not. Id.

The respondent also argues that Rogers is inapposite because it addressed a statutory, rather than a constitutional, challenge to a court's incomplete and misleading *ex parte* answer to a jury question. Id. at 24 (discussing Rogers, 422 U.S. at 40-41). Finally, the respondent asserts that the evidence of the petitioner's guilt was "overwhelming," based on the identification testimony, the victim's opportunity to observe the petitioner at close range during the scuffle and the DNA evidence. Id. at 25.

### 3. *Petitioner's Reply*

The petitioner replies that by not responding to them, the respondent has conceded his arguments that the trial court's *ex parte* answer violated his right to counsel and his right to have the jury decide his case based solely on the evidence adduced at trial. Dkt. No. 18 at 1-2. He asserts that the reason his

16

lawyer wanted the court to tell the jury to rely on its collective memory is because "there are a host of issues with the Victims identification of [the petitioner]." Id. at 2. He argues that State v. Burton, 112 Wis. 2d 560 (Wis. 1983), cited by the respondent, is distinguishable. Id. He describes what he believes to be the appropriate process for a judge to use when a jury sends a note. Id. at 2-3. He says that a judge's failure to discuss a note with the parties results in the aggrieved party having lost the opportunity to convince the judge to give a different response. Id. at 3. The petitioner asserts that his lawyer was not given the opportunity to make a constitutional objection once the judge told the parties what had happened, because by that point, the jury had reached a verdict. Id.

The petitioner asserts that his own lawyer's statement that the numbers of a six pack are always different from the numbers in an array "is a misunderstanding of rudimentary statistics that event the circuit court understood." Id. at 4. He argues that there is a possibility that "a suspect can appear in the same position in a photo array as in the six-pack even if the six-pack is made before the photo array and even if the photos are shuffled." Id. He says that it would have been "reasonable for the jury to infer that the folder numbers in the photo array would match the numbers of the pictures in the six-pack." Id.

In asserting that the court's error was not harmless, the petitioner argues that the respondent "overstates the significance of the DNA evidence," observing that there were at least two other contributors to the DNA profile

17

recovered from the hat. Id. at 5. He says the State's expert testified that DNA could remain "on a hat for a long time, potentially for years," and that she could not tell how long the petitioner had been in contact with the hat. Id. He again wonders why, if the victim identification and the DNA evidence were compelling enough to sustain a conviction, the jury would ask whether the six pack numbering system was the same order as the photo array folders. Id.

The petitioner says that the jury "would have believed the circuit court's answer had [the petitioner's] approval because they had been told questions would be answered after consulting with the parties." Id. He says the court's subsequent explanation for why it gave the answer it gave shows that its answer was incorrect. Id. He disputes that the State's case was overwhelming. Id. at 6. The petitioner says that "[a] deliberating jury appeared uncomfortable convicting [him] based upon the proof presented." Id. He argues that the appellate court's analysis was objectively unreasonable because the impact of the trial court's answer cannot be determined. Id. at 7.

4.  *Discussion*

a.  The petitioner's right to be present

"The Confrontation Clause of the Sixth Amendment provides the right to be present at all critical stages of the criminal proceedings." Moore v. Knight, 368 F.3d 936, 940 (7th Cir. 2004). "The Due Process Clause supplements [a defendant's Confrontation Clause right] by protecting the defendant's right to be present during some stages of the trial where the defendant's ability to confront a witness against him is not in question—*ex parte* communications

18

between the judge and jury fall into this category." Id. See also, United States v. Neff, 10 F.3d 1321, 1323 ("A criminal defendant's right to be present at every stage of trial is rooted to a large extent in the Confrontation Clause of the Sixth Amendment . . . and is protected to some extent by the due process clause of the Fifth and (in state cases) the Fourteenth Amendment.") The defendant's right to be present at every stage of the trial includes the right to be present during "the giving of supplementary jury instructions or other communications with a deliberating jury." Neff, 10 F.3d at 1324. When a judge is presented with a communication from a jury, "(1) the jury's questions should be answered in open court; and (2) defendant's attorney should be given an opportunity to be heard before the district judge responds to the jury's questions." Id.

The Wisconsin Court of Appeals agreed that the petitioner and his counsel had the right to be present when the circuit court responded to the jury's question. Dkt. No. 9-2 at ¶22. So does this court; the trial judge committed constitutional error by answering the jury's question outside of the presence of the petitioner (or at least his counsel) and without first giving the defense the opportunity to be heard.

"[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." United States v. Gagnon, 470 U.S. 522, 526 (1985) (quoting Rushen v. Spain, 464 U.S. 114, 125-26 (1983)). "Such communications between the judge and jury will violate the defendant's right only when the defendant's presence, 'has a relation, reasonably substantial, to the fulness of his opportunity to defend

19

against the charge.'" <u>Moore</u>, 368 F.3d at 940 (quoting <u>Gagnon</u>, 470 U.S. at 526). A court will "look to see if the communications had a prejudicial effect on the defendant and rendered the trial 'fundamentally unfair.'" <u>Id.</u> (quoting <u>Ellsworth v. Levenhagen</u>, 248 F.3d 634, 640 (7th Cir. 2001)). <u>See</u> <u>Neff</u>, 10 F.3d at 1325 (noting that the Seventh Circuit usually applies the harmless error standard when a trial court communicates with a jury outside the defendant's presence). The Wisconsin Court of Appeals concluded that even though the trial judge committed constitutional error, that error was harmless. It is that conclusion that the petitioner challenges.

>    b.    The harmless error standard

The Supreme Court has explained that there is a category of constitutional violations called "trial error." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 629 (1993). "Trial error 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" <u>Id.</u> (quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 307-08 (1991)). "At the other end of the spectrum of constitutional errors lie 'structural defects in the constitution of the trail mechanism, which defy analysis by "harmless-error" standards.'" <u>Id.</u> (citing <u>Fulminante</u>, 499 U.S. at 309). The Supreme Court gave the example of denying someone the right to counsel, which would "require[] automatic reversal of the conviction" because that error infected the entire trial process. <u>Id.</u> at 629-30.

In <u>Chapman v. California</u>, defendants convicted in California state court petitioned the United States Supreme Court for review of the California Supreme Court's affirmation of their conviction; the court had held that the prosecutor's comments on the fact that the defendants did not testify at their trial constituted harmless error. <u>Chapman</u>, 386 U.S. at 19-20. The Supreme Court granted *certiorari* to determine whether a violation of <u>Griffin v. California</u>, 380 U.S. 609 (1965) (in which the Supreme Court held that it is a violation of the Fifth—and, in a state case, the Fourteenth—Amendment for a prosecutor to comment on an accused's failure to testify and for a court to instruct a jury that failure to testify is evidence of guilt)—could constitute harmless error. <u>Chapman</u>, 386 U.S. at 20. The <u>Chapman</u> Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." <u>Id.</u> at 24. Since <u>Chapman</u> was decided in 1967, the Supreme Court has applied the <u>Chapman</u> "harmless-beyond-a-reasonable-doubt" harmless error standard in directly reviewing claims of the "trial error" types of constitutional errors.

But in <u>Brecht</u>, the Supreme Court observed that "it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review." <u>Brecht</u>, 507 U.S. at 636. The Court explained that "[s]tate courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman*, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error." <u>Id.</u> In

Case 2:19-cv-00658-PP   Filed 10/14/22   Page 21 of 43   Document 22

contrast, "[o]verturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters," and "granting habeas relief merely because there is a "'reasonable probability"' that trial error contributed to the verdict . . . is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has 'grievously wronged.'" Id. at 637 (quoting Chapman, 386 U.S. at 24). The Supreme Court concluded that, rather than the Chapman harmless-error-beyond-a-reasonable-doubt standard, "the *Kotteakos* [*v. United States*, 328 U.S. 750 (1946)] harmless-error standard applies in determining whether habeas relief must be granted because of a constitutional error of the trial type." Id. at 638. Under Kotteakos, an error is not harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776.

> Citing the need to afford appropriate respect to final state-court decisions that have already endured direct appeal, including potential review in [the Supreme] Court, *Brecht* effectively inverted *Chapman*'s burden. [*Brecht*], 507 U.S., at 635 . . . Rather than require the prosecution to prove that a constitutional trial error is harmless, *Brecht* held that a state prisoner seeking to challenge his conviction in collateral federal proceedings must show that the error had a "'substantial and injurious effect or influence'" on the outcome of his trial. *Id.*, at 637 . . .

Brown v. Davenport, ___ U.S. ___ 142 S. Ct. 1510, 1519 (2022).

On *habeas* review, then, this court must determine whether the petitioner has demonstrated that the state-court judge's *ex parte* answer to the jury's question "had a substantial and injurious effect or influence in

22

determining the jury's verdict." But that is only step one of the two-step process. "When a state court has ruled on the merits of a prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA." <u>Brown</u>, 142 S. Ct. at 1517. "[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." <u>Id.</u> at 1524.

> When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable. *Cullen v. Pinholster,* 563 U.S. 170, 181 . . . (2011); *Fry* [*v. Pliler*], 551 U.S., [112,] at 119 [(2007)]. To accomplish that, a petitioner must persuade a federal court that no "fairminded juris[t]" could reach the state court's conclusion under [the Supreme Court's] precedents. [*Davis v.*] *Ayala*, 576 U.S., [257,] at 269 . . . [(2015)] (internal quotation marks omitted). . . . By contrast, under *Brecht* a petitioner may prevail by persuading a federal court that it alone should harbor "grave doubt"—not absolute certainty—about whether the trial error affected the verdict's outcome. *O'Neal v. McAnnich*, 513 U.S. 432, 435 . . . (1995). In sum, where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict.

<u>Id.</u> at 1525.

The <u>Davenport</u> Court reversed the Sixth Circuit's grant of *habeas* relief because it concluded that the Sixth Circuit had completed only one step of the two-step process: it had decided only that under <u>Brecht</u>, it harbored grave doubts about the jury's verdict. <u>Id.</u> "It did not claim that every reasonable jurist would share its doubts. Nor did it purport to hold that the Michigan state courts had acted contrary to or unreasonably applied a decision of [the Supreme] Court." <u>Id.</u> at 1525-26. The <u>Davenport</u> Court concluded that "if

AEDPA makes winning habeas relief more difficult, it is because Congress adopted the law to do just that." Id. at 1526.

So this court first must determine under Brecht whether the petitioner has demonstrated that the state-court judge's constitutional error had a substantial and injurious effect or influence on the outcome of the case. If it answers "yes" to that question, the court then must determine under AEDPA whether the petitioner has demonstrated that no fairminded jurist could conclude that the Wisconsin Court of Appeals reasonably applied clearly established Supreme Court law in concluding that the error was harmless.

c.    Brecht substantial and injurious effect

At trial, Emanuelson testified that the victim selected the photo in folder 3, and that that folder contained the petitioner's photo. Dkt. No. 9-8 at 60-61, Tr. Page 60 lines 15-25; Tr. Page 61 line 1. While the respondent did not provide a full transcript of Emanualson's testimony, the petitioner's brief to the Wisconsin Court of Appeals recounts what he averred:

> Emanualson testified that [the victim] was not shown the six-pack during the photo array—she was shown the eight folders (R66:60; R67:21). Emanuelson explained that, pursuant to police department protocol, [the petitioner] could only have been in folders two through five, because the target is never in folders one or six and seven and eight are empty (R67:20-21). Emanuelson testified that he did not know which folder [the petitioner] was in, but knew that [the petitioner] was in folders two through five (id.: 20-21). Emanuelson testified that [the victim] picked out folder three, which he said contained [the petitioner's] photo (R66:60; App. 301).

Dkt. No. 9-4 at 7-8. When the judge was advising the parties about the jury's question, he stated that "in the six pack . . . [t]he number 2, the folders was

24

Number 3." Dkt. No. 9-10 at 3, Tr. Page 3 lines 5-6.[2] In his brief to the Court of Appeals, the petitioner conceded that his photo was at "number two in the six-pack and number three in the photo array." Dkt. No. 9-4 at 16.

Because there is no dispute that the petitioner's photo was number two in the six pack and number three in the array, the judge's answer to the jury's question was correct. The petitioner spills much ink arguing that it is mathematically possible to have an array that is numbered identically to a six pack, even though the six photos from the six pack are shuffled before being placed in six of the eight array folders, the suspect's photo is not placed in folders one or six and folders seven and eight are left empty. That argument is a red herring—there is no dispute that the petitioner's photo was number two in the six pack and number three in the array. The judge's "no" answer to the question whether the six pack numbering system was the same as the order on the photo/folders in the photo array was correct.

Under the Brecht analysis, however, the question is whether, by providing that correct answer rather than conferring with the parties—particularly the petitioner and his counsel—about whether to give that or some other answer, the judge had a substantial and injurious impact on the outcome of the case. If the judge had consulted with the parties before answering the jury's question, and had decided to give a different answer than the one he gave, would the jury have returned a verdict of not guilty? Stated conversely,

---

[2] The court reporter appears to have believed that the words "in the six pack" were the tail-end of the jury's question, rather than the beginning of the judge's own statement.

would the jury have returned a not-guilty verdict if the judge had consulted with the parties, adopted defense counsel's recommendation and told the jury to rely on its collective recollection of the evidence?

The petitioner implies that the answer to that question is "yes." He argues that the jury would have incorrectly believed that he and his lawyer had been consulted and had agreed to the "no" answer, because earlier in the trial, the judge had told the jury that he would consult with the parties before answering any questions. He argues that the fact that the jury returned its verdict "shortly" after the judge answered their question demonstrates that the answer influenced their decision. And he argues that the evidence was not as strong as the respondent argues that it was.

The petitioner likely is correct that regardless of what answer the judge gave, the jury would have assumed that he had conferred with the parties before giving it, because the judge told the parties that was what he would do. This is circumstantial evidence that the jury accepted the answer as authoritative, and that it would have accepted any other answer as authoritative. It is not clear how long after the judge answered the jury's question they reached their verdict; the judge told the parties that the jury had indicated it had the verdict "shortly after" he had given the "no" response. Dkt. No. 9-10 at 3, Tr. Page 3 lines 13-16. Depending on how long the judge meant by "shortly," this may be circumstantial evidence that the "no" answer did not drive the jury to engage in extensive additional deliberation.

26

In considering whether the "no" answer had a substantial and injurious impact on the outcome of the case, one must ask why the jury asked for the six pack and why they wanted to know whether the six pack numbering system was the same as the order on the photo folders in the photo array. The petitioner believes the jury assumed that the two numbering systems should have been the same and was trying to figure out whether the fact that the petitioner's photo was numbered differently in the two sets somehow demonstrated error either in the victim's identification or law enforcement's investigation. This speculation does not address why the jury asked for the six pack to begin with. Emanuelson testified that the victim did not see the six pack, begging the question why the jury would feel the need to see it and why they asked how it was numbered (particularly when both Emanuelson and Kohler had testified that the six photos were shuffled before being put into the eight array folders).

During cross-examination, defense counsel asked the victim, "Before you took a look at [the photo array folders], did you think that suspect was going to be in those folders?" Dkt. No. 9-8 at 30, Tr. Page 30 lines 9-11. The victim responded, "Yes." Id. at line 12. When defense counsel asked the victim why she believed the suspect's photo would be among those in the array, the victim responded, "Because he told me he was going to get him." Id. at lines 13-14. When defense counsel asked who told the victim that "he" was going to "get him," the victim responded, "[t]he cop," and nodded at Emanuelson. Id. at lines

27

15-19. She later said that "they"—the police "said they was going to get him."

Id. 30-31, Tr. Page 30 at line 25; Tr. Page 31 at line 1.

The victim also told defense counsel that she described the perpetrator to the police as being "car[a]mel dark skinned." Id. at 31, Tr. Page 31 at line 25. She said that she described to the police what his hair looked like, saying, "He had hair. He had braids." Id. at 32, Tr. Page 32, lines 1-2.

During his closing argument, the prosecutor told the jury that

. . . a month later, the woman that's argu—that's fighting with him, that's struggling with him, when shown photos, when thinking that there's eight photos that she's going to be looking at, is able to pick him up with no difficulty.

And keep in mind the look that we have today is not the look that he had then. She testified—[the victim]] testified to you that there were some rolls on his hair.[3] This look's not the look that he had then, and she's told as she goes to look at the photos, maybe he is and maybe he's not. And she's able to pick him out.

I want to think for just a second. Reason with me for just a second. If he's innocent, how unlucky is it that the man that she can identify just coincidentally lost his hat at the exact same spot, on the exact same day, at the exact same time. Does that sound reasonable to you? Is—Does that sound reasonable? Because both identifications are independent of each other. We get the hat. His DNA comes back, and he's identified in a photo lineup, and his photo's in there because of the DNA.

But she has no difficulty picking him out. He's the third photo. As we go through, they show the first, no. Then they show the second photo, no. Then they show the third photo, yes. We continue through, and they show—she looks at the rest.

---

[3] It is not clear what the prosecutor meant by his statement that the victim testified that there were "some rolls on his hair." The victim testified that she told the police that the perpetrator had braids. The transcript of her testimony did not mention the word "rolls."

28

She doesn't have any trouble identifying him today. Even with the change in appearance. You saw the photos. She's the one that you'd expect.

Dkt. No. 9-9 at 67-68, Tr. Page 67 lines17-25; Tr. Page 68 lines 1-22.

During her closing argument, the petitioner's counsel told the jury that the investigation could have been "a little bit more complete." Dkt. No. 9-9 at 73, Tr. Page 73 at lines 17-19. She said, "Probably should have followed everything exactly on the photo array," although she did not say how the officers failed to "exactly" follow "everything." Id. at lines 22-23. She told the jury that the victim:

> described in court that she told the officers that [the suspect] had braids, that—and this was really important to me—that the person that robbed her was—both had a dark complexion and was also caramel in complexion. Those are two different things, and I want you to really think about that. How can the person who robbed her have dark complexion and caramel complexion at the same time?

> There's an easy answer for this, and that's the photo array. And this is why I spent time on that. First of all, we have one person without braids, and we're just going to take him off because we know that he doesn't match the other ones. We also have one person with a tattoo on his neck. Very visible. Also he stands out. We're left with four people, and these people were compiled off of this photo. Because when the DNA came back, they matched it with a photo, and they picked everybody else out of that photo—for the fillers from that photo. He has braids in this photo.

> [The victim] did, according to Officer Kohler, did not say that he had braids. It was not until after this photo array was conducted that we hear [the victim] saying that the person has braids. It wasn't until after this photo array was conducted did we hear her describe anyone as of a caramel complexion. She's getting the ID based off of this photo array, and this is really important because we talked about the percentages. Yes. I admit, it is unlucky. But she has a 25 percent chance. If we all had a 25 percent chance at playing the Lotto, we would do it every day because those are very good odds. That's why it is so important to make sure that the fillers all look

29

like each other and that no one stands out. And two people in here, two separate people, stand out.

Id. at 74-76, Tr. Page 74 lines 22-25; Tr. Page 75 lines 1-25; Tr. Page 76 lines 1-7.

Later in her closing, defense counsel said:

> The reason why that photo array is so important because she told you she thought that the person was going to be in there. She was going for it from the get-go. She wanted to make that identification, but it is not a reliable identification.

Id. at 78, Tr. Page 78 lines 9-14.

In his rebuttal, the prosecutor told the jury that

> [The victim is] able to pick him out when we get to the third one. It talks about people with tattoos on their neck. Told the cops early on there's braids. I don't know. I see braids. Braids. Braids. Braids. Maybe braid in number 2. I can't tell. It depends how you want to interpret that. I don't know where the braid was. Was it one braid in the back? If that's the case, number 6 may potentially work as well.

Id. at 85, Tr. Page 85 lines 16-24.

The defense spent significant time challenging the photo array. It emphasized the fact that the victim expected that the array would contain a photo of the perpetrator. It cast doubt on the victim's testimony that after the offense, she'd described the perpetrator to the police as having braids and strongly implied that it was the photo array that planted the idea of braids in the victim's mind, not her memory of the perpetrator. The defense argued that the jury should exclude two of the five filler photos as too dissimilar and implied that the victim had randomly selected one of the four remaining photos, meaning that she had a 25% chance of selecting the petitioner. And the

30

defense argued that the fact that the petitioner's DNA was on the hat the perpetrator left at the scene did not mean that he was the person who left it there.

The court did not send any evidence to the jury room after closing arguments. Dkt. No. 9-9 at 92, Tr. Page 92 lines 12-14 ("With regard to the exhibits, my practice is not to send anything back unless they ask for it.). There is no indication that the jury asked for any evidence other than the six pack. Cleary one or more jurors had a question about the photo array, one they believed seeing the six pack would answer. Once they saw the six pack, one or more jurors had a question about whether the position of the petitioner's photo in the six pack was the same as the position of his photo in the array folders, despite having heard testimony from the officers that the six pack photos were shuffled before being placed in the array folders. The head-scratcher is why the answer to that question mattered to the jury. It seems that the answer would have been relevant only if one or more jurors were concerned that the officers had *not* shuffled the six pack photos before being placing them in the array folders (perhaps due to the defense suggestion that the officers did not "follow everything exactly on the photo array"). If that was what was concerning the jurors, it could mean they had questions about the credibility of the officers who showed the victim the array. The judge's *ex parte* answer might have resolved that credibility question.

That analysis contains many "may haves" and "mights" and "coulds." The petitioner speculates about why he thinks the jury asked its question; the

court's analysis also is speculation. Is such speculation enough to meet the petitioner's burden of showing that the judge's error had a substantial and injurious impact on the outcome of the case? It is difficult to say. The jury had evidence that the victim struggled with the perpetrator and observed him at close range. It had evidence that the perpetrator's hat came off at the scene. It had evidence that the defendant was the major contributor of the DNA found on that hat, compared to another minor contributor and the possibility that there was a third contributor. It had evidence that a month after the offense, the victim selected a photo of the petitioner from six photos—at least four of which the defense did not argue were dissimilar to each other—as the person who tried to rob her. The person whose photo the victim selected was the major contributor of the DNA on the cap the perpetrator left at the scene. Certainly the jury had more than enough evidence to convict the petitioner. But that is not the standard.

The Seventh Circuit has granted *habeas* relief where the state appellate court analyzed the sufficiency of the evidence, explaining that "a statement of what 'a rational jury could conclude' is not a statement of a harmless-error inquiry; it instead is the question presented when a direct appeal asks whether there is sufficient evidence to support a verdict." Jensen v. Clements, 800 F.3d 892, 903 (7th Cir. 2015). The Seventh Circuit emphasized that in making a harmless error determination, the court must "look at the influence the [error] had on the verdict." Id. at 904. When the error is a judge's *ex parte* communication with the jury, the court must consider whether the

32

communication "had a prejudicial effect on the defendant and rendered the trial 'fundamentally unfair.'" Moore, 368 F.3d at 940 (quoting Ellsworth, 248 F.3d at 640).

Without knowing why the jury wanted to see the six pack and what concern motivated it to ask whether the six pack numbering system was the same as the order on the photo folders in the photo array, it is impossible to know whether the judge's "no" answer to that question had a substantial and injurious impact on the jury's verdict. Given that impossibility, the court cannot say that the judge's constitutional error was harmless under Brecht.

<div align="center">d.    AEDPA</div>

"Proof of prejudice under *Brecht* does not equate to a successful showing under ADEPA." Davenport, 142 S. Ct. at 1525. Although the court cannot say that the state court's error was harmless under Brecht, it still must determine whether the Wisconsin Court of Appeals' conclusion that the error was harmless constituted an unreasonable application of established Supreme Court precedent.

The United States Supreme Court decided Chapman in 1967. At the time of the petitioner's direct appeal, then, there was clearly established Supreme Court precedent that "when a defendant demonstrates on direct appeal that a constitutional error occurred at his trial, his conviction cannot stand unless the government proves the error's harmlessness 'beyond a reasonable doubt.'" Davenport, 142 S. Ct. at 1523 (quoting Chapman, 386 U.S. at 24). The Wisconsin Court of Appeals did not mention the Chapman harmless-beyond-a-

<div align="center">33</div>

reasonable-doubt standard and did not use the words "harmless error beyond a reasonable doubt." The Wisconsin appellate court stated:

> An examination of a defendant's right to be present is subject to the harmless error analysis. *See* **State v. Stenseth**, 2003 WI App 198, ¶¶19-20, 266 Wis. 2d 959 . . . "The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction." **State v. Sullivan**, 216 Wis. 2d 768, 792, . . . (1998). A reasonable possibility is one which is sufficient to undermine confidence in the outcome of the proceeding. **State v. Patricia A.M.**, 176 Wis.2d 542, 556, . . . (1993). We must look to the totality of the record. *See id.* at 556-57.

Dkt. No. 9-2 at 8.

The respondent argues that this standard is "in line with *Chapman.*" Dkt. No. 15 at 20. The language the Wisconsin appellate court used does not read like Chapman, or the Supreme Court's later applications of Chapman. See, e.g., Satterwhite v. Texas, 486 U.S. 249, 258-59 (1988) (explaining that the issue was whether the state had "proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"); Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) ("The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.").

But the Wisconsin Court of Appeals referenced other Wisconsin cases holding that the standard it applied is akin to the Chapman standard. In Sullivan, the Wisconsin Supreme Court stated:

> The test for harmless error is whether there is a reasonable probability that the error contributed to the conviction. The conviction must be reversed unless the court is certain the error did

34

not influence the jury. The burden of providing no prejudice is on the beneficiary of the error, here the State. The State must establish that there is no reasonable possibility that the error contributed to the conviction.

Wisconsin v. Sullivan, 216 Wis.2d 768, 792-93 (Wis. 1998) (citations omitted).

In Patricia A.M., the Wisconsin Supreme Court went further:

> The test for whether an error was harmless is whether there is no reasonable possibility that the error contributed to the conviction, a reasonable possibility being one which is sufficient to undermine confidence in the outcome of the proceeding. *State v. Dyess*, 124 Wis. 2d 525, 543 . . . (1985); *In Interest of J.A.L.*, 162 Wis. 2d 940, 972 . . . (1991). This test is consistent with the "harmless beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 24 . . . (1967). *See State v. Rewolinski*, 159 Wis. 2d 1, 28 . . . (1990). Thus, a reviewing court must look to the totality of the record and determine whether the error contributed to the trial's outcome. *State v. Evers*, 139 Wis. 2d 424, 447 . . . (1987).

Wisconsin v. Patricia A.M., 176 Wis. 2d 542, 556-57 (Wis. 1993).

The court concludes that the Wisconsin Court of Appeals applied the Chapman standard—the standard it was required to apply when considering on direct appeal whether the constitutional trial error was harmless. "When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable." Davenport, 142 S. Ct. at 1525 (citation omitted). "[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." Fry, 551 U.S. at 119. "Unreasonable" is not the same as "incorrect." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)). A federal court cannot grant *habeas* relief

35

"so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). " . . . AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial . . . ." Davenport, 142 S. Ct. at 1525.

The Wisconsin Court of Appeals stated that it could not conclude that without the judge's "no" answer, the result of the trial would have been different based on the following reasoning:

> First, the trial court answered the question based on undisputed trial testimony. Emanuelson testified that the six pack is for internal use only and that the photos contained in the photo array are shuffled before a victim views the folders. Kohler confirmed the shuffling process. Defense counsel conceded that the numbering systems are different. Indeed, [the petitioner's] photo was second in the six pack and third in the photo array, confirming the difference in numbering systems. Moreover, when defense counsel told the trial court that counsel would have preferred the jury be told to rely on its collective memory, the trial court rejected the suggestion. In short, the trial court's answer was factually correct. The fact would not have changed even if [the petitioner] and/or his counsel were present when the trial court answered the jury's question. *See **May v. State***, 97 Wis.2d 175, 184 . . . (1980) (where the trial court answered the deliberating jury's question outside of the presence of the defendant and counsel, the court committed harmless error because its answer was correct and not prejudicial to the defendant).
>
> Second, the trial court's error does not undermine our confidence in the outcome of the trial because there is sufficient evidence to support the verdict. [The victim] twice identified [the petitioner] as the man who robbed her—once during the photo array, where she expressed "100 percent" certainty in her identification, and again at trial. [The victim] also testified that during the struggle for her purse, she knocked [the petitioner's] knit cap off of his head. The cap contained [the petitioner's] DNA. We therefore cannot conclude that without the trial court's answer, the result of the trial would have been different.

Dkt. No. 9-2 at 9-10.

The Wisconsin Court of Appeals unreasonably applied Supreme Court precedent in the *second* part of that analysis. As the Seventh Circuit explained in <u>Jensen</u>, the harmless error analysis does not ask whether there was sufficient evidence to allow a reasonable jury to convict. But this court cannot conclude that fairminded jurists would agree that the *first* part of the appellate court's analysis was incorrect. Fairminded jurists could conclude that because the trial court's answer to the jury's question was correct and based on undisputed trial testimony, and because the trial court explicitly stated that had defense counsel asked the court to tell the jury to rely on its collective recollection the court would have refused that request, the trial judge's constitutional error was harmless beyond a reasonable doubt. Other fairminded jurists could conclude, for reasons similar to this court's, that there is some reasonable doubt as to whether the error was harmless. But when fairminded jurists could disagree, a petitioner is not entitled to *habeas* relief.

The court will deny *habeas* relief as to the petitioner's argument that the trial court's error in answering the jury's question outside his presence was not harmless.

C.    <u>Right to Remain Silent at Sentencing</u>

1.    *Petitioner's Brief in Support of the Petition*

The petitioner says that he was penalized with a harsher sentence "solely because he availed himself of one of his constitutional rights to remain silent." Dkt. No. 10 at 14. The petitioner says that the trial court "made it clear it would be imposing a harsher sentence because [the petitioner] did not confess

37

to the crime." Id. Specifically, the petitioner references the discussion he had with the sentencing court during in which the judge told him that he could have points toward a lighter sentence if he admitted guilt while apologizing but that the court was unwilling to give him those points without such an admission. Id. Although the prosecutor was not involved in that discussion, the petitioner says that "[a]ny effort by the state to compel a defendant to testify against his will at the sentencing hearing clearly would contravene the *U.S. Const. amend. V.*" Id.

2. *Respondent's Opposition*

The respondent argues that the petitioner was not required to speak at the sentencing hearing. Dkt. No. 15 at 29. The respondent asserts that the petitioner also had the option of accepting responsibility and expressing remorse, but that the petitioner instead chose to "inconsistently express remorse but *not* admit guilt when given the opportunity to exercise his right of allocution." Id. (emphasis in the original). The respondent argues that the court's statement that it could not give him "points"—credit, basically—for failing to take responsibility by admitting what he did was not punishment for the petitioner's failure to admit guilt, but a refusal to give the petitioner credit against his sentence for acceptance of responsibility. Id. The respondent noted that in its order denying the petitioner's request for post-conviction relief, the court had emphasized that it didn't pressure the petitioner to respond; it simply asked for an explanation of the petitioner's comment that he wanted to take responsibility for what happened to the victim. Id.

The respondent argues that it was reasonable for the court of appeals to conclude that the judge was trying to establish why the petitioner was apologizing, and that it was appropriate for that court to consider the petitioner's lack of remorse. Id. at 30.

3. *Petitioner's Reply*

The petitioner replies that that the court "clearly conditioned [his] receipt of a lesser sentence upon [his] giving up one of his constitutional rights, then imposed a harsher sentence because [the petitioner] did not give up his right against self-incrimination." Dkt. No. 18 at 9. He points specifically to the judge's question, "Did you do it?" Id. The petitioner disputes the court of appeals' conclusion that the judge did not commit error because he did not rely solely upon the petitioner's refusal to admit guilt when fashioning the sentence. Id. at 10. He claims that the appellate court misinterpreted controlling precedent, asserting that "[t]here is a significant difference between 'solely' relying upon an improper factor and 'actually' relying upon an improper factor." Id. He says the question is whether the improper factor formed part of the basis for the court's decision, and argues that it did in his case. Id.

4. *Discussion*

The Supreme Court has held that "a judge or other sentencing authority is to be accorded very wide discretion in determining an appropriate sentence. The sentencing court or jury must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." Wasman v. United States,

468 U.S. 559, 563 (1984). On the other hand, the Court has recognized that the Due Process Clause of the Fourteenth Amendment constrains sentencing discretion in certain limited instances; "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978).

The Court has held that the Fifth Amendment circumscribes a sentencing judge's discretion; "[t]he normal rule in a criminal case is that negative inference from the defendant's failure to testify is permitted," and the court "decline[d] to adopt an exception for the sentencing phase of a criminal case with regard to factual determinations respecting the circumstances and details of the crime." Mitchell v. United States, 526 U.S. 314, 327-28 (1999) (citation omitted). But the Seventh Circuit has explained that

> "[S]ilence can be consistent not only with exercising one's constitutional right, but also with a lack of remorse." *Burr v. Pollard*, 546 F.3d 828, 832 (7th Cir. 2008). A lack of remorse is a proper sentencing consideration "because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways)."*Id.* Sometimes it can be "difficult to distinguish between punishing a defendant for remaining silent and properly considering a defendant's failure to show remorse" in sentencing. *Id.* (quoting *Bergmann v. McCaughtry*, 65 F.3d 1372, 1379 (7th Cir. 1995)).

United States v. Keskes, 703 F.3d 1078, 1090-91 (7th Cir. 2013).

In Keskes, the Seventh Circuit observed that the defendant had not "assert[ed] his Fifth Amendment privilege at the sentencing hearing." Id. at 1091. It explained that if the defendant had done so, "he would have alerted the court to the fact that his silence should be viewed as an exercise of his

constitutional right rather than a lack of remorse." Id. The court also emphasized that the sentencing judge had advised the defendant that he did not have to speak at the sentencing, and that the court had "identified other factors besides [the defendant's] silence that reflected a lack of remorse." Id.

The trial court here did not punish the petitioner for refusing to incriminate himself. Like the defendant in Keskes, the petitioner did not invoke his right to remain silent. He chose to speak, telling the judge he wanted to apologize to the victim. The judge then asked the petitioner what he wanted to apologize for, asking whether the petitioner committed the crime. But the court told the petitioner that he did not have to tell the court whether he had done so. The trial court, like the court in Keskes, considered among the sentencing factors the fact that the petitioner had not expressed remorse. The court stated that it could not credit the petitioner for responsibility he had not accepted.

As for the court's questions of the petitioner, the court explained in denying the post-conviction motion that it was trying to figure out what the petitioner was apologizing for. It explained that it could not give the petitioner a lesser sentence based on acceptance of responsibility when the petitioner did not accept responsibility. At no time did the judge say that he was *increasing* the petitioner's sentence for refusing to incriminate himself.

The Wisconsin Court of Appeals' conclusion that the judge did not punish the petitioner for refusing to incriminate himself and thus that the petitioner was not entitled to a new sentencing hearing was not contrary to clearly established federal law, did not result from an unreasonable application

41

of that clearly established law and did not result from an unreasonable determination of the facts. The court will deny *habeas* relief on this issue.

### III.    Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted).

Because the court has concluded that reasonable jurists could debate, or disagree, about whether the trial court's *ex parte* communication with the jury constituted a constitutional error that was harmless beyond a reasonable doubt, the court will grant the petitioner a certificate of appealability.

### IV.    Conclusion

The court **DISMISSES** the petition for writ of *habeas corpus* under 28 U.S.C. §2254. Dkt. No. 1.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

The court **ISSUES** the petitioner a certificate of appealability.

Dated in Milwaukee, Wisconsin this 14th day of October, 2022.

<div style="margin-left: 40%;">

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

</div>